# In the United States Court of Federal Claims

No. 23-321
Filed: April 18, 2024

---

|  |  |
|---|---|
| JACQUELINE R. SIMS | ) |
| D/B/A JRS STAFFING SERVICES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant. | ) |

---

*Jacqueline Sims*, *pro se*, for plaintiff.

*Daniel Bertoni*, U.S. Department of Justice, Civil Division, Washington, DC, for defendant.

**OPINION AND ORDER**

***SMITH*, Senior Judge**

This pre-award protest comes before the Court on the parties' Cross-Motions for Judgment on the Administrative Record. Plaintiff Jacqueline R. Sims, an individual and sole proprietor doing business as "JRS Staffing Services," challenges the terms of Request for Quotation No. 15BFA022Q00000086 (the "Solicitation") issued by the Federal Bureau of Prisons (the "Agency") to solicit spiritual services for the Life Connections Program at the Federal Medical Center, Carswell. *See generally* Second Amended Complaint, ECF No. 19 [hereinafter Second Am. Compl.]. Specifically, plaintiff challenges the Solicitation's process, or lack thereof, for notifying contractors in the event that their employees failed credit screening by the Agency. *Id.* at 9–19. In response, defendant, the United States of America, argues that the Agency adequately described rational procedures for evaluating employees' credit reports. *See generally*, Defendant's Third Motion to Dismiss and Motion for Judgment on the Administrative Record, ECF No. 25 [hereinafter Def.'s MJAR].

The Court, for the reasons set forth below, agrees with defendant. Accordingly, the Court grants defendant's Motion for Judgment on the Administrative Record and denies plaintiff's Cross-Motion for Judgment on the Administrative Record. Because defendant's dispositive motion is granted, Defendant's Motion to Dismiss is found as moot.

# I.     Background

## A.     The Solicitation for Spiritual Guides at Federal Medical Center, Carswell

On May 11, 2022, the Agency initiated market research to acquire the services of three on-site Spiritual Guides for the Life Connections Program ("LCP") at the Federal Medical Center, Carswell ("FMC"), an administrative security federal medical center in Fort Worth, Texas. *See* Administrative Record at 1–8, ECF No. 22-2 [hereinafter AR]. After the Agency posted a Sources Sought Notice on SAM.gov—with both a Statement of Work and a Market Research Questionnaire for interested parties to complete and return—it received three responses, *including one from plaintiff*. *Id.* at 1–3, 11–30. On July 7, 2022, relying in part on these responses, the Agency produced a market research report concluding that the required Spiritual Guide services were commercially available. *Id.* at 32–34.

On July 13, 2022, the Agency posted the Solicitation seeking procurement of LCP Spiritual Guides. *Id.* at 35–37. Any resulting contract from the Solicitation would be a single-award, indefinite-delivery contract with firm-fixed pricing. *Id*. at 44. The contract would be awarded to the offeror whose quotation presented "the best value to the Government considering the price and past performance history." *Id.* at 71. The Agency estimated that it would make its award decision by August 2022. *Id.* The contract would commence around October 1, 2022, with a one-year period of performance and four one-year option periods. *Id.*

According to the Solicitation, the Spiritual Guides would be in "frequent and unsupervised contact" with inmates, including thirty hours per week of classroom instruction and/or interactive sessions. *Id.* The Agency would therefore screen these Spiritual Guides "for security related matters," which included requiring the contract awardee to complete numerous investigative processes and procedures—like a credit check—before "any Contractor employees [we]re permitted inside [FMC]." *Id.* at 45, 164, 167–8. The Agency specifically highlighted the "require[ment] that contractor personnel have a 'favorable credit report,'" going as far as to "<u>strongly encourage[] [quoters] to <u>pre-screen potential candidates for credit issues before submitting the candidate to FMC Carswell</u></u>." *Id*. at 45 (emphasis in original).

Quotations were originally due on or before August 11, 2022. *Id*. at 38. Plaintiff sent two emails—one on August 3, 2022, and a second on August 8, 2022—to the Agency with questions regarding whether there was an incumbent contractor, and the insurance requirements for contractors. *Id*. at 90–95. Dissatisfied with the Agency's responses, *see id.*, plaintiff filed an agency-level protest on the same day that quotations were due, *id*. at 96.

B.     **Procedural History**

1.     **Agency-Level Protest**

On August 11, 2022, plaintiff protested the Solicitation before the Agency, challenging numerous aspects of the procurement including: the proof of insurance requirement; the timeline for completing security requirements; and the Solicitation's inclusion contract clause DOJ-03 Personnel Security Requirements for Contractor Employees (Nov. 2021) ("DOJ-03") in the awarded contract. *Id*. at 96–121. Relevant here, plaintiff asserted that neither the DOJ-03 clause nor the Solicitation defined what "constitutes a favorable credit report." *Id.* at 116

On February 9, 2023, the Agency issued a decision sustaining plaintiff's protest in part and denying it in part. *Id*. at 132–41. The Agency agreed with plaintiff that the Solicitation's requirement for proof of insurance at the time of quote submission was ambiguous, and amended the Solicitation to make proof of insurance due after the contract award. *Id.* at 134. But the Agency denied plaintiff's protest as to two other grounds—the timeline for completing security requirements, and the inclusion of the DOJ-03 clause—after finding a rational basis for these requirements. *Id*. at 135–41.

On February 14, 2023, plaintiff requested reconsideration of the Agency's decision to keep the Solicitation's DOJ-03 clause. *Id*. at 142. On March 3, 2023, the Agency relented: It eliminated the DOJ-03 clause when it issued Solicitation Amendment No. 15BFA022Q00000086-0001 ("Amendment 1"). On April 5, 2023, it informed plaintiff of its decision to remove the DOJ-03 clause. *Id*. at 158–60.

2.     **Plaintiff's First Complaint**

On March 6, 2023, plaintiff filed a pre-award bid protest with this Court, challenging the inclusion of the DOJ-03 clause in the original Solicitation. Complaint at 1, ECF No. 1. [hereinafter Compl.]. On March 24, 2023, defendant filed a Motion to Dismiss arguing that Amendment 1, which eliminated the DOJ-03 clause, rendered plaintiff's claims moot. Defendant's First Motion to Dismiss at 1, ECF No. 10 [hereinafter Def.'s First Mot. to Dismiss].

3.     **Plaintiff's Amended Complaint**

Almost simultaneously with defendant's First Motion to Dismiss, plaintiff filed an Amended Complaint that dropped all claims regarding the DOJ-03 clause and raised three new claims alleging that: (1) plaintiff is entitled to a formal decision by the Agency on her request for reconsideration; (2) Amendment 1 is unclear regarding whether a credit check of contract staff is required and what constitutes a favorable credit check; and (3) Amendment 1 is ambiguous concerning the dates of performance and the expected quantity of hours. First Amended Complaint at 17, 21, 25, ECF No. 11 [hereinafter First Am. Compl.].

- 3 -

Then, on April 3, 2023, the Agency issued a Notice of Corrective Action, outlining the Agency's intent to file Amendment No. 15BFA022Q00000086-0002 ("Amendment 2") to the Solicitation, extending the quotation due date to April 17, 2023.  *See* Defendant's Notice of Corrective Action at 1, EFC No. 12 [hereinafter Def.'s Not. of Corrective Action].  Shortly thereafter, the Agency initiated three more substantive Solicitation amendments:

- Amendment No. 15BFA022Q00000086-0003 ("Amendment 3") on April 5, 2023;

- Amendment No. 15BFA022Q00000086-0004 ("Amendment 4") on April 20, 2023; and

- Amendment No. 15BFA022Q00000086-0005 ("Amendment 5") on May 2, 2023.

AR 163, 166–67.  Important to the instant protest, Amendment 3 clarified that the Agency would "conduct a credit review on contractor staff as part of standard procedure" post-award.  *Id*.  Amendment 4 explained that the Agency would evaluate "credit reports individually with attention to the needs and concerns of the particular institution."  *Id*. at 166.  Amendment 5 provided specifics on the credit review process by adding language clarifying that the Agency "evaluates credit reports within its sole discretion and on a case-by-case basis" and is not subject to bright-line rules given the concern for safety and security.  *Id*. at 167.  Amendment 5 also included the following language:

> [The Agency] conducts credit reviews of contractor staff as part of its standard procedure.  [The Agency] evaluates credit reports within its sole discretion on a case-by-case basis, with a goal of ensuring the safety of all individuals within, and the security of, [Agency] facilities.  The credit review process requires the exercise of [the Agency's] judgment on matters of safety and security and is not susceptible to bright-line rules.  When [the Agency's] review of a credit report reveals derogatory information, such as past-due debt, delinquency, bankruptcy, or default, that derogatory information normally must be resolved before a contractor staff's credit report will be deemed acceptable.  Depending on the circumstances, resolution of derogatory information may require that the contractor staff provide pertinent evidence, such as, in the case of a past-due debt, a statement of the reason for a past-due debt, documentation showing a debt is disputed, documentation showing full payment of a debt, and/or documentation establishing a payment plan.  Absent a resolution of derogatory information, a contractor staff's credit report normally will not be deemed acceptable by [the Agency].

*Id*.

On May 5, 2023, defendant filed a second Motion to Dismiss, arguing that Amendments 3, 4 and 5 mooted plaintiff's claims in her First Amended Complaint.  *See* Defendant's Second Motion to Dismiss at 1, ECF No. 14 [hereinafter Def.'s Second Mot. to Dismiss].

### 4.    Plaintiff's Second Amended Complaint

On May 15, 2023, the Court granted plaintiff's Motion for Leave to file a Second Amended Complaint.  *See* Plaintiff's Unopposed Motion for Leave to Amend Complaint, ECF No. 15; Order Granting Plaintiff's Unopposed Motion for Leave to Amend Complaint, ECF No. 16.  To account for this ongoing litigation, defendant issued Solicitation Amendment No. 15BFA022Q00000086-0006 ("Amendment 6") on May 24, 2023, extending the Solicitation's due date for quotations to September 1, 2023.  AR 168.

On May 31, 2023, plaintiff filed her Second Amended Complaint.  *See* Second Am. Compl. at 1.  On June 6, 2023, defendant filed an unopposed Motion to Withdraw its earlier Motions to Dismiss.  *See* Defendant's Consent Motion to Withdraw Motions to Dismiss at 1, ECF No. 21.

On June 23, 2023, defendant filed a third Motion to Dismiss, or in the alternative, Motion for Judgment on the Administrative Record.  *See* Def.'s MJAR at 1.  On July 14, 2023, plaintiff filed her response to defendant's Motion to Dismiss and Cross-Motion for Judgment on the Administrative Record.  *See* Plaintiff's Response and Cross-Motion for Judgment on the Administrative Record at 1, ECF No. 31 [hereinafter Pl.'s CMJAR].  On July 21, 2023, defendant filed its response and reply.  *See* Defendant's Response to Plaintiff's Cross-Motion for Judgment on the Administrative Record and Reply in support of its Motion to Dismiss, ECF No. 33 [hereinafter Def.'s Reply].  On July 31, 2023, plaintiff filed a Reply in support of its Cross-Motion for Judgment on the Administrative Record.  *See* Plaintiff's Reply to Response Motion, ECF No. 36 [hereinafter Pl.'s Reply]; *see also* ECF No. 38 (duplicative of ECF No. 36).

Also on July 31, 2023, plaintiff moved for leave to file a declaration addressing harm suffered.  *See* Plaintiff's Motion for Leave to File Declaration, ECF No. 37.  On August 14, 2023, defendant filed a response to plaintiff's Motion, objecting to portions of the declaration that spoke to the merits of plaintiff's protest.  *See* Defendant's Response to Plaintiff's Motion for Leave to File Declaration, ECF No. 39.  On August 21, 2023, plaintiff filed a reply.  *See* Plaintiff's Reply to its Motion for Leave to File Declaration, ECF No. 41.

## II.    Standard of Review

### A.    Bid Protests

The Tucker Act grants this Court jurisdiction over bid protest actions.  28 U.S.C. § 1491(b)(1).  The Court has "jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded."  *Id.*  Reviewing such actions under the Administrative Procedure Act ("APA"), this Court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *See Bannum v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005) (citing 5 U.S.C. § 706(2)(A)).  In the bid protest context, the Court will set aside agency action if "either (1) the procurement official's decision lacked a rational basis; or

(2) the procurement procedure involved a violation of regulation or procedure." *See Impresa Construzioni Geom. Domenico Gurufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).

### B.   Motions for Judgment on the Administrative Record

A party may move for judgment on the administrative record, requesting that the Court assess "whether the administrative body, given all disputed and undisputed facts appearing in the record, acted in a manner that complied with the legal standards governing the decision under review" pursuant to RCFC 52.1. *See Supreme Foodservice GmbH v. United States*, 109 Fed. Cl. 369, 382 (2013). On such a motion, the parties are limited to the administrative record, and the Court must make findings of fact as if it were conducting a trial on a paper record. R. Ct. Fed. Cl. 52.1; *Bannum,* 404 F.3d at 1354. The Court will then determine whether a party has met its burden of proof based on the evidence in the record. *See Bannum*, 404 F.3d at 1355.

## III.   Discussion

This case, at its heart, concerns a single question: Did the Agency's Solicitation credit check requirement comply with regulatory requirements?

Defendant argues that the Agency complied with regulatory requirements because the Solicitation "provides all material terms of the services sought, explains how to submit quotations, and states how quotations will be evaluated." Def.'s MJAR at 20 (citing AR 43–46, 71). Defendant states that the Solicitation offers "'sufficient detail' to permit offerors to compete intelligently and on a relatively equal basis," a standard extracted from the Federal Acquisition Regulation ("FAR") and oft enumerated in case law. *Id.* at 19–20. Defendant also asserts that the Agency's credit check requirement reasonably shifts risk to the offeror as a special contract condition. *Id.* at 22.

Plaintiff's response is chiefly concerned with the Agency's credit check requirement. To her, the Solicitation violates FAR 11.002 and FAR 12.202—which govern the Agency's description of its needs—because the Solicitation "lacks sufficient information about material credit report requirements," and is "silent as to whether the [c]ontractor will be notified if the credit report of its employee contains derogatory [information]." Pl.'s CMJAR at 31–32. Plaintiff argues that the Agency is irrationally "withhold[ing] the best available information about the scope of the agency's notification process (when a credit report contains derogatory information that must be resolved)" and withholding guidelines used to evaluate credit reports prevented plaintiff from performing her duties properly. *Id.* at 30–36.

Here, the record illustrates that the Agency's Solicitation and its requirements meet the standards prescribed by FAR Part 11 and Part 12. Accordingly, plaintiff has failed to meet its burden of showing a clear and prejudicial violation of the regulation. *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001).

- 6 -

FAR Part 11 implements statutory requirements for planning and solicitation development in the federal procurement process. 41 U.S.C. §§ 3306(a), 3307. Its requirements are simple but nonetheless crucial: FAR 11.002 requires agencies to clearly define their acquisition needs—such as specifying needs using "market research," FAR 11.002(a)(1); stating requirements with the performance required, *see* FAR 11.002(a)(2)(i)(B); and promoting requirements that "enable and encourage" offerors to supply commercial items and services, FAR 11.002(a)(2)(ii).

In line with FAR 11.002, the Agency identified its need—Life Connections Program's Spiritual Guides services—and conducted market research to determine the necessary performance required and the availability of these services in the commercial marketplace. Specifically, the Agency developed a Statement of Work that detailed the work to be performed, such as inmate management, security requirements, and mandatory training, as part of the Sources Sought Notice. AR 9–10. Then, the Agency conducted market research by contacting recommended vendors and soliciting market capabilities from industry—which plaintiff responded to as illustrated by her completed Market Research Questionnaire. AR 11–16, 32–34. In the Agency's Market Research Report, the Agency documented the history of this requirement, the market research conducted, and the Agency's final findings, including the determination that the Agency's need was "available on the commercial market" such that "the procurement will be conducted using FAR Part 12." AR 32–34. No more, despite plaintiff's contrary hopes, is required.

Building off Part 11, FAR Part 12 implements statutory requirements for simplified acquisition procedures of commercial items and services. 41 U.S.C. §§ 1906, 1907, 3307. Under this framework, market research is the touchstone for defining an agency's needs, the related solicitation's terms, as well as developing "sufficient" descriptive "detail" to solicit potential offerors with suitable commercial items and services. Therefore, "[m]arket research . . . establishes the foundation for *the agency description of need (see part 11)*, the solicitation, and resulting contract." *See* FAR 12.202(a) (emphasis added).

The same facts that satisfy FAR Part 11 meet the market research threshold in FAR 12.202. Additionally, the Solicitation sufficiently details the Agency's needs such that offerors know which commercial services are suitable and the related requirements for service, including the credit check requirement. The Solicitation listed several investigative processes and procedures that contractor employees must satisfy before entering a correctional institution, including a credit check, and it included the following notice to offerors regarding credit reports:

> Quoters should also note that contract clause 52.24-403-70, *Notice of Contractor Personnel Security Requirements (Oct 2005)* requires that contractor personnel have a "favorable credit report." <u>Quoters are strongly encouraged to pre-screen potential candidates for credit issues before submitting the candidate to FMC Carswell.</u>

AR 45 (emphasis in original).  To be sure, plaintiff is not challenging the inclusion of the credit report requirement in the Solicitation, but rather takes issue with the Agency's notification process and disclosure guidelines for an acceptable credit check.  To this point, Agency amended the Solicitation not once—but twice—to provide offerors more information regarding the credit report procedures:

> BOP evaluates credit reports individually with attention to the needs and concerns of the particular institution. If a review of a credit report turns up issues BOP deems of concern, BOP will notify the contracting officer to resolve the concerns.

AR 166 (Amendment 0004).

> BOP conducts credit reviews of contractor staff as part of its standard procedure. BOP evaluates credit reports within its sole discretion on a case-by-case basis, with a goal of ensuring the safety of all individuals within, and the security of, BOP facilities. The credit review process requires the exercise of BOP's judgment on matters of safety and security and is not susceptible to bright-line rules. When BOP's review of a credit report reveals derogatory information, such as past-due debt, delinquency, bankruptcy, or default, that derogatory information normally must be resolved before a contractor staff's credit report will be deemed acceptable. Depending on the circumstances, resolution of derogatory information may require that the contractor staff provide pertinent evidence, such as, in the case of a past-due debt, a statement of the reason for a past-due debt, documentation showing a debt is disputed, documentation showing full payment of a debt, and/or documentation establishing a payment plan. Absent a resolution of derogatory information, a contractor staff's credit report normally will not be deemed acceptable by BOP.

AR 167 (Amendment 5).

These amendments resolve any credit report issues; the revisions expressly detail the procedure surrounding derogatory credit reports.  AR 167.  Plaintiff's insistence otherwise thus belies reality.  Pl.'s CMJAR at 32 (claiming that  Agency's Solicitation "lack sufficient information" because "the Contractor will [not] be notified if the [Agency] deems that a Contractor employee's credit report contains derogatory information that must be resolved.").  If plaintiff is concerned that an individual employee may not pass a credit check, she could pre-screen employees credit reports to ensure that they pass, *as recommended in the Solicitation*. *See* AR 45.  Granted, it is possible that plaintiff's pre-screening efforts may fail.  But her

concerns that she may not be notified of an employee's derogatory credit report, should such circumstances arise, cannot be reviewed now because that issue is a matter of contract administration, which plaintiff expressly recognizes.  Pl.'s CMJAR at 32 ("Here, even though the credit check requirements would take place post-award if the awardee is a company . . ."); *see Kellogg Brown & Root Servs., Inc. v. United States*, 117 Fed. Cl. 764, 770 (2014) (finding questions of contract administration must be brought under the Contract Disputes Act and not within the Court's bid protest jurisdiction under the Tucker Act).  In sum, plaintiff has not established a clear and prejudicial violation of FAR 11.002 and FAR 12.202, and therefore, the Court denies her claims.

The Court concludes that plaintiff has not succeeded on the merits of either of her claims.  The Court, therefore, need not address plaintiff's remaining requests for relief, namely plaintiff's request for a permanent injunction and monetary relief in the form of bid and proposal costs.  *See* Compl. at 19–20; *FirstLine Transp. Sec., Inc. v. United States*, 119 Fed. CL. 116, 127 (2014) (explaining that, of the four factors considered when assessing permanent injunctive relief, "[s]uccess on the merits is the most important factor"); *E.W. Bliss Co. v. United States*, 77 F.3d 445, 447 (Fed. Cir. 1996) ("[A] losing competitor may recover the costs of preparing its unsuccessful proposal if it can establish that the Government's consideration of the proposals submitted was arbitrary or capricious").

## IV.   Conclusion

For the reasons above, defendant's MOTION for Judgment on the Administrative Record, ECF No. 25, is hereby **GRANTED**.  Plaintiff's CROSS-MOTION for Judgment on the Administrative Record, ECF No. 31, is hereby **DENIED**.  Because defendant's dispositive MOTION for Judgment on the Administrative Record is granted, defendant's other outstanding MOTIONS regarding dismissal, ECF Nos. 10, 14, 21, and plaintiff's MOTION for Leave to File Declaration, ECF No. 37, are **FOUND AS MOOT**.  The Clerk of Court is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ *Loren A. Smith*

Loren A. Smith,
Senior Judge